UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WENDELL HOLMES,

        Plaintiff,

                                         Case No. 06-CV-10361

vs.                                  HON. GEORGE CARAM STEEH

ALPHONSO R. JACKSON,
Secretary of Housing and Urban Development,

        Defendant.

_____/

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (#19)

      Defendant Secretary of Housing and Urban Development Alphonso Jackson

(hereinafter "HUD") moves for summary judgment of plaintiff Wendell Holmes' claims of

race discrimination, gender discrimination, retaliation, and hostile work environment under

Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq., and constructive

discharge and disparate treatment under the Rehabilitation Act of 1973, 29 U.S.C. §§ 701

et seq..  A hearing on the motion was held on September 17, 2007.  For the reasons set

forth below, defendant HUD's motion for summary judgment will be GRANTED.

## I. Background

      Plaintiff Holmes alleges he was demoted to a meaningless position in February 2002

from his position as HUD's Director of the Michigan Program Center, leading to his

constructive discharge on April 11, 2003.  Holmes alleges the unlawful discrimination began

after he underwent treatment for Graves disease, and after he supported HUD employee

Shelly Horton's pursuit of a race discrimination claim against Holmes' subordinate, Branch

Chief Frank Della Penna.  Counts I, II, IV, and V, respectively, allege Title VII claims of race

discrimination, gender discrimination, unlawful retaliation, and a hostile work environment. Count III alleges disability discrimination in violation of the Rehabilitation Act of 1974. Consistent with the briefs submitted by the parties, Holmes' Counsel acknowledged at the September 17, 2007 hearing that Holmes has withdrawn his Title VII claims. Consequently, only Holmes' Count III claims under the Rehabilitation Act remain at issue.

Holmes began working for HUD in 1980, was appointed Acting Director of Michigan's Fair Housing and Equal Opportunity Office in 1994, and was made the permanent Director of the Michigan Office in 1995. A 1998 HUD reorganization created three Midwest Program Center Offices, located in Detroit, Chicago, and Columbus, with Holmes becoming Director of the Michigan Program Center. Midwest HUB Director Barbara Knox supervised the three Program Centers, and was Holmes' direct supervisor. Holmes acted as Branch Chief Della Penna's direct supervisor, although the two split the general responsibilities of the Detroit Center, with Holmes monitoring HUD program compliance and Della Penna investigating Title VIII discrimination claims.

Holmes testified at his deposition that he told Knox in February 1998 that he had a thyroid condition. Holmes later gave Knox a February 5, 1999 letter written by a Dr. Rosenblatt which conveyed that "it is likely that Mr. Holmes has Grave's [disease] in spontaneous remission." Holmes testified that after he shared the letter with Knox before taking sick leave in early 2001, Knox responded:

> A. (by Holmes) [Knox] said that she had an aunt with Graves disease and that aunt was really mean before she died. . . . .

Holmes May 9, 2007 Deposition Transcript, at 19.

A memo in the record written by Knox states that Holmes returned from extended sick leave in October 2001 "and almost immediately got into a petty argument with the

branch chief, Frank Della Penna." Plaintiff's July 30, 2007 Exhibit D. Knox's memo represents that she sent Holmes an e-mail relating that she had "hoped he might return to the office with a better perspective," and that she believed Della Penna took a job in Washington D.C. due in part to Holmes' hostility toward him and Holmes' efforts to undermine Della Penna's authority. Id. In a July 21, 2001 e-mail from Knox to Holmes discussing Holmes' alleged practice of locking his office door and hindering access to files, Knox remarks: ". . . I'm troubled by your seeming inflexibility and paranoia --- really I am. I'm going to 'chalk' the tone of your memo up to your apparent illness, and hope you get well soon." Plaintiff's July 30, 2007 Exhibit F. In August 2001, Holmes was informed that he had been mis-diagnosed as having Graves disease. On February 26, 2002, Knox and Knox's direct supervisor, General Deputy Assistant Secretary Floyd May, traveled to Detroit and reassigned Holmes. According to Holmes, May told him that "I was going to be removed until I got my health together." Holmes May 9, 2007 Deposition Transcript, at 15. Holmes acknowledged that he was also told he was being removed due to complaints made by Holmes' subordinates such as Leanette Jenkins, who testified that "people felt like they were walking on egg shells because you felt really you were in a pressure cooker," that "there was a lot of tension in the office," that "Holmes would have arguments with staff," and that "[y]ou just didn't know day-to-day who was going to be picked on next." Jenkins May 10, 2007 Deposition Transcript, at 19-20.

Holmes was not put on a performance improvement plan (PIP), and there was no job description for his new assignment working for Acting Director Diane Johnson. Holmes described his new responsibilities as an "errand boy" for Johnson. Holmes also argues he was treated differently than Della Penna, who substituted for Holmes when Holmes was on sick-leave. According to Holmes, Della Penna was permitted to take a position in

Washington D.C. after an administrative law judge determined Della Penna had unlawfully discriminated against Shirley Horton while, in contrast, Holmes was assigned to a menial position. Holmes proffers evidence that Della Penna was given administrative help, while Holmes was denied clerical help.

Holmes retired on April 11, 2003. Holmes testified he believed he was removed from his position as Michigan Program Center Director because of: (1) his involvement with Shirley Horton's EEO complaint against Della Penna; and (2) Knox's perception "that my suspected Graves disease made me ill-tempered and short with staff and mean." Holmes May 9, 2007 Deposition Transcript, at 16.

## II. Motion For Summary Judgment

HUD moves for summary judgment arguing that Holmes cannot prove he was "disabled" for purposes of the Rehabilitation Act because the alleged perceived impairment of "meanness" does not substantially limit a major life activity. HUD asserts it is also entitled to summary judgement because: (1) Holmes was not qualified for his Director position because he was a poor manager; (2) Holmes cannot make a requisite showing that he was reassigned or treated differently solely because of his alleged perceived disability; (3) Holmes cannot prove he was constructively discharged because Holmes cannot show that his new assignment was intolerable, and because Holmes admitted that he retired because he feared he would lose retirement pay if he were instead discharged.

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." See Redding v. St. Eward, 241 F.3d 530, 532 (6th Cir. 2001). The standard for determining

whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Amway Distributors Benefits Ass'n v. Northfield Ins. Co., 323 F.3d 386, 390 (6th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences arising therefrom must be construed in a light most favorable to the non-moving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Redding, 241 F.3d at 532 (6th Cir. 2001). If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 270 (1968); see also McLean v. 988011 Ontario, Ltd., 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence. Anderson, 477 U.S. at 252. Rather, there must be evidence on which a jury could reasonably find for the non-movant. McLean, 224 F.3d at 800 (citing Anderson, 477 U.S. at 252).

## III. Analysis

Analysis of claims under the Rehabilitation Act and Americans with Disabilities Act run roughly parallel, and "[b]y statute, the Americans with Disabilities Act standards apply in Rehabilitation Act cases alleging employment discrimination." Mahon v. Crowell, 295 F.3d 585, 588-589 (6th Cir. 2002) (quoting McPherson v. Michigan High School Athletic Ass'n, 119 F.3d 453, 459-60 (6th Cir. 1997) (citing 29 U.S.C. § 794(d)). To make out a prima facie claim of employment discrimination under the Rehabilitation Act, the plaintiff must show: (1) he is a "disabled" person under the Act; (2) he was otherwise qualified to

perform the job's requirements with or without reasonable accommodation; and (3) he was discriminated against solely because of his disability. Id at 589 (citing Monette v. EDS Corp., 90 F.3d 1173, 1178 (6th Cir. 1996) (ADA); Doherty v. Southern College of Optometry, 862 F.2d 570, 573 (6th Cir. 1988) (Rehabilitation Act)). A person is considered "disabled" if he has a physical or mental impairment which substantially limits one or more major life activities, and either a record of such an impairment or is perceived to have the impairment, whether or not the impairment exists. See 29 U.S.C. § 705(20)(b).

### A. Substantially Limited Major Life Activity

Holmes concedes that he was informed in August 2001 that he was mis-diagnosed as having Graves disease. Holmes' Rehabilitation Act claims are therefore necessarily premised on proving that HUD *perceived* that Holmes was suffering from an impairment that substantially limited a major life activity. While Holmes stresses that Graves disease is a recognized "impairment" for purposes of the Rehabilitation Act, see Harris v. H & W Contracting Co., 102 F.3d 516, 520 (11th Cir. 1996) (ADA), Holmes has failed to come forward with evidence that HUD perceived "meanness" allegedly resulting from Graves disease as a substantial limitation upon any major life activity. Holmes has not identified a major life activity of his that HUD perceived was significantly impaired by Graves disease. To the extent the allegations and proffered evidence could be construed as asserting that HUD perceived Holmes as too "mean" to work as the Director of the Michigan Program Center, a plaintiff seeking to prove that an impairment substantially limited the major life activity of "working" must be able to show that he was perceived as unable to work in a broad class of jobs. Sutton v. United Airlines, 527 U.S. 471, 492 (1999) (interpreting ADA). "To be substantially limited in the major life activity of working, . . . one must be precluded from more than one type of job, a specialized job, or a particular job of choice." Id at 491.

It is undisputed that HUD reassigned Holmes to another job within HUD's Michigan Program Center after removing him from his position as Director.

> . . . . [A]n employer is free to decide that physical characteristics or medical conditions that do not rise to the level of an impairment – such as one's height, build, or singing voice – are preferable to others, just as it is free to decide that some limiting, but not *substantially* limiting, impairments make individuals less than ideally suited for the job.

Id at 490-91 (emphasis added). Absent evidence that HUD perceived Holmes as *substantially* limited in a major activity such as working, HUD was free to decide that Knox's ill-tempered manner, shortness with staff, and "meanness" made Holmes less that ideally suited for the managerial job of Michigan Program Center Director.

Holmes nonetheless argues that the situation here is analogous to cases where employers wrongfully perceive that an employee inflicted with AIDS is "disabled." Society's myths, fears, and stereotypes about certain diseases are as disabling as the limitations that arise from an actual impairment, and may cause an employer to perceive that an employee "has a substantially limiting impairment when, in fact, the impairment is not so limiting." Sutton, 527 U.S. at 489. Holmes has not proffered any evidence or authority to support his proposition that, similar to AIDS, prevalent myths, fears, and stereotypes about Graves disease have generally caused employers to misperceive impairments resulting from the disease. Holmes' analogy to AIDS cases is not well taken, and cannot serve as a substitute for proof that his employer HUD actually perceived him as suffering from a substantially limiting impairment.

Holmes has failed to proffer evidence that could support a finding that HUD perceived him as suffering from an "impairment" that substantially limited one or more major life activities. First Nat'l Bank, 391 U.S. at 270. Consequently, Holmes cannot prove that he is a "disabled" person entitled to recovery under the Rehabilitation Act. Mahon, 295

F.3d at 589; 29 U.S.C. § 705(20)(b). HUD is entitled to summary judgment of Holmes' claims of constructive discharge and disparate treatment under the Rehabilitation Act as a matter of law. Id; Amway, 323 F.3d at 390.

Having determined that Holmes cannot maintain an action under the Rehabilitation Act as a "disabled" person, the court need not further address the merits of the separate claims of constructive discharge and disparate treatment. The court chooses to address the claims, however, in the alternative.

### B. Constructive Discharge

To prevail on a claim of constructive discharge, the plaintiff must prove that: (1) the employer deliberately created intolerable working conditions as viewed by a reasonable person; and (2) the employer did so with the intent of forcing the employee to quit. Logan v. Denny's, Inc., 259 F.3d 558, 568-569 (6th Cir. 2001) (quoting Moore v. KUKA Welding Sys., 171 F.3d 1073, 1080 (6th Cir. 1999) (quotations omitted)). A constructive discharge may be shown where "the plaintiff quits in reasonable response to an employer-sanctioned adverse action officially changing [his] employment status or situation, for example, a humiliating demotion[.]" Pennsylvania State Police v. Suders, 542 U.S. 129, 133 (2002). See also Logan, 259 F.3d at 569 (outlining seven factors to be considered in deciding whether working conditions were intolerable: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation calculated to encourage resignation; and (7) offers of early retirement or continued employment on less favorable terms). "To determine if there is a constructive discharge, both the employer's intent and the employee's objective feelings must be examined." Id at 569 (quoting Moore, 171 F.3d at 1080).

To support his claim that he was constructively discharged when reassigned in February 26, 2002 to work for Acting Director Johnson, Holmes testified that he was made Johnson's "errand boy," which included getting coffee and breakfast for Johnson, chauffeuring Johnson, answering phones and taking messages, and performing other clerical work. Holmes May 9, 2007 Deposition Transcript, at 52. Holmes also testified that his speaking engagements were cancelled by Knox, who also gave him other specific assignments, including attending "about four or five" meetings with other federal agencies. Id at 53. Holmes could establish at trial that the factors of a reduction in job responsibilities and reassignment to perform menial tasks weigh in favor of finding that his working conditions were humiliating and intolerable. Suders, 542 U.S. at 133; Logan, 259 F.3d at 569. Nevertheless, it is undisputed that Holmes maintained the same service grade, his salary was not reduced, he was not reassigned to work under a younger supervisor, he was not badgered or harassed for the purpose of encouraging his resignation, and he was not offered early retirement or continued employment on less favorable terms. Id. It is also undisputed that Holmes remained employed in his reassignment for over a year, from February 26, 2002 until he retired on April 11, 2003.

Holmes explained that he retired on April 11, 2003 because he feared he would be fired or demoted to a GS-12 service grade, and thereby lose his pension if, as he expected, Knox gave him an "unsatisfactory" final rating in February or March of 2003 for the 2002 work year. Holmes May 9, 2007 Deposition Transcript, at 56-58.

> Q. The sole reason for you retiring in 2003 was because you were afraid that if you got fired, you were going to lose your monthly pension?
>
> A. [by Holmes] Yes, or I would be downgraded and moved outstate to someplace I didn't want to be.

Id at 60. Holmes admitted that no one within HUD told him within HUD that he was going

to be fired or downgraded, and that his source for the belief that he would lose his pension if fired or downgraded was not someone from the HUD Personnel Department, but "our deputy in the Detroit office, and he's pretty good on personnel matters and I got the little retirement book." Id at 59-60.

Construing the pleadings and evidence in a light most favorable to Holmes, Holmes' own testimony places beyond reasonable dispute that he did not retire in response to the reduction in his job responsibilities and his reassignment to a job involving menial and humiliating tasks. Suders, 542 U.S. at 133; Logan, 259 F.3d at 569. Holmes remained in his new assignment for over a year, then chose to retire for "the sole reason" that he erroneously believed he was going to be fired from, or downgraded out of, his reassignment and lose his pension; Holmes did not retire in response to his alleged intolerable working conditions. The court notes that Holmes does not dispute HUD's argument that Holmes would not have lost his pension had he been fired or downgraded. Ultimately, Holmes cannot prove his claim of constructive discharge because Holmes cannot prove consistent with his own explicit testimony that he retired from HUD because of intolerable working conditions. Suders, 542 U.S. at 133; Logan, 259 F.3d at 569. HUD is entitled to summary judgment of Holmes' constructive discharge claim as a matter of law even assuming Holmes is a "disabled" person under the Rehabilitation Act. Amway, 323 F.3d at 390.

## C. Disparate Treatment

To establish a prima facie case of disparate treatment under the Rehabilitation Act, the plaintiff must produce evidence that: (1) he is a member of the protected class; and (2) that for the same or similar conduct, he was treated differently than similarly situated employees outside the protected class. Seay v. Tennessee Valley Authority, 339 F.3d 454, 479 (6th Cir. 2003). To show that an employee is similarly situated, the plaintiff must be

able to prove that "all of the relevant aspects of his employment situation were 'nearly identical' to those of the [non-minority's] employment situation." Id (quoting Pierce v. Commonwealth Life Ins. Co., 40 F.3d 796, 802 (6th Cir. 1994)).  To prevail on a claim of disability discrimination under the Rehabilitation Act, the plaintiff must show he was discriminated against solely because of his disability.  Mahon, 295 F.3d at 589.

Holmes alleges he was treated differently than Branch Chief Della Penna in that Della Penna was approved to receive clerical help while substituting for Holmes, and Della Penna was permitted to transfer to a position in Washington D.C. after an administrative law judge found him responsible for race discrimination with respect to HUD employee Shirley Horton. It is undisputed that Holmes and Della Penna split the responsibilities of the Detroit Center, even though Holmes was Della Penna's direct supervisor, with Holmes monitoring HUD program compliance and Della Penna investigating Title VIII discrimination claims.  While Holmes alleges Della Penna was approved to receive additional clerical help while Della Penna substituted for Holmes and performed both tasks, Holmes does not allege or proffer evidence that he ever substituted for Della Penna and performed both responsibilities.  Holmes has also failed to proffer evidence that Della Penna was transferred to a different job in Washington D.C. for the same or similar conduct as Holmes, or that Della Penna's new assignment was any less challenging than Holmes' reassignment.  Consistent with the court's finding that Holmes cannot prove he was constructively discharged, Holmes argument that he was discharged while Della Penna was permitted to continue working at HUD is without merit.  Even assuming Holmes was "disabled" for purposes of the Rehabilitation Act, Holmes has failed to proffer evidence that could support a finding that he was treated differently than a similarly-situated Della Penna for the same or similar conduct.  Seay, 339 F.3d at 479.  Further, and consistent with his

testimony that he was removed from his position as Michigan Program Center Director because of his involvement with Shirley Horton's EEO complaint against Della Penna and his alleged "disability," Holmes cannot make the requisite showing that he was treated differently than Della Penna solely because of the disability. <u>Mahon</u>, 295 F.3d at 589. HUD is entitled to summary judgment of Holmes' disparate treatment claim even assuming Holmes is a "disabled" person under the Rehabilitation Act. <u>Amway</u>, 323 F.3d at 390.

## IV. Conclusion

Defendant HUD's motion for summary judgment is hereby GRANTED. Plaintiff Wendell Holmes' claims are hereby DISMISSED with prejudice in their entirety.

SO ORDERED.

Dated: November 26, 2007

<u>s/George Caram Steeh</u>
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on November 26, 2007, by electronic and/or ordinary mail.

<u>s/Josephine Chaffee</u>
Deputy Clerk